UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| IN RE: YRC WORLDWIDE, INC.<br>ERISA LITIGATION | : <br> : <br> : <br> : | Case No. 09-cv-02593 JWL/JPO |

## CONSOLIDATED COMPLAINT

Plaintiffs Eva L. Hanna, Shelley F. Whitson, Daniel J. Cambra and Patrick M. Couch and ("Plaintiffs"), participants in the YRC Worldwide Inc. Retirement Savings Plan (the "Plan"),[1] during the proposed Class Period (defined below), allege as follows on behalf of the Plan, themselves and as a class of all others similarly situated:

### NATURE OF ACTION

1.      This is an action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries.

2.      Plaintiffs were participants in the Plan during the Class Period at which time the Plan held interests in the common stock of YRC Worldwide, Inc and its affiliated corporations ("YRCW or the "Company"). Plaintiffs bring this action on behalf of a class of all Participants in the Plan for whose individual accounts the Plan invested in YRC Worldwide Inc. Stock ("YRCW Stock" or "Company Stock") through the Company Stock Fund (the "Fund") from October 25, 2007 to the present (the "Class Period").

---

[1]      Effective December 31, 2008, the Yellow Corporation Retirement Savings Plan merged with the Yellow Roadway Corporation Core Retirement Plan, the YRC Regional Transportation, Inc. 401(k) Retirement Plan, the New Penn Motor Express, Inc. Profit Sharing Plan, and the New Penn Motor Express, Inc. 401(k) Retirement Plan and was renamed the "YRC Worldwide Inc. 401(k) Plan." YRC Worldwide Inc. 401(k) Plan (effective January 1, 2009), YRCW-000001-YRC-000072 ("Plan Document") at 2 (Attached hereto as Exhibit A); *see also* Forms 5500 filed with the Department of Labor in 2008 for the New Penn Motor Express, Inc. 401(k) Retirement Plan, and the YRC Regional Transportation, Inc. 401(k) Retirement Plan, YRC Worldwide Inc. 401(k) Plan (YRCW-000815, YRCW-000824, YRCW-000840, YRCW-000849, YRCW-000873 and YRC-000880). As used herein, "Plan" includes YRC Worldwide 401(k) Plan and all predecessor plans.

1

3.      401(k) plans confer tax benefits on participating employees to incentivize saving for

retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the

option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part

of his or her retirement investment portfolio.  Common stock of YRCW was one of the investment

alternatives of the Plan throughout the Class Period.

4.      Plaintiffs allege that Defendants, who acted as "fiduciaries" of the Plan as that term is

defined under ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duties owed to

the Plan and the Participants, including those fiduciary duties set forth in ERISA §§ 404(a) and 405,

29 U.S.C. §§ 1104(a) and 1105, and Department of Labor Regulations, 29 C.F.R. § 2550.  As a result

of these breaches, Defendants are liable to the Plan for all losses resulting from each breach of

fiduciary duty.  Plaintiffs also seek equitable relief.

5.      Plaintiffs' claims arise out of the Plan's continuing imprudent investment in YRCW

Stock. The Plan's continued investment was imprudent because YRCW was an excessively risky

investment for retirement assets in light of the Company's dire financial condition, which included:

> (a)    deteriorating demand for trucking services and increased expenses;
>
> (b)    significant difficulties securing appropriate credit facilities while the Company was experiencing debilitating increases in operating costs;
>
> (c)    an excessive increase in the Company's debt to equity ratio;
>
> (d)    numerous downgrades of YRCW's credit ratings; and
>
> (e)    an exorbitantly high debt-default and bankruptcy risk, including an Altman Z-score ("Z-score") - a financial formula commonly used by financial professionals to predict whether a company is likely to go bankrupt - which indicated that YRCW was on the verge of bankruptcy.

2

6.     As a consequence of these excessive risks, it was a breach of fiduciary duty for Defendants to:  (a) continue offering Company Stock as a Plan investment option when such stock was an imprudent investment option; (b) invest Plan assets in the Fund and Fund assets in YRCW Stock; (c) fail to provide complete and accurate information to participants in the Plan regarding the Company's financial condition and the prudence of investing in Company Stock; and (d) maintain the Plan's pre-existing heavy investment in YRCW equity when Company Stock was no longer a prudent investment option for the Plan.

7.     As these risks increased to imprudent levels, Defendants did not take appropriate action to protect the Plan's assets invested in YRCW Stock.  Consequently, the Plan and its participants suffered significant losses.

8.     Plaintiffs allege that it was imprudent to permit the Plan to invest in YRCW Stock during the Class Period because the investment in the Fund was excessively risky as the Company teetered on the brink of bankruptcy (Count I).  Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and the participants' best interests in mind.  Plaintiffs also allege that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering YRCW Stock as an investment option and investing Plan assets in YRCW Stock when it was no longer prudent to do so (Count III).   Finally, Plaintiffs allege that all Defendants are liable as co-fiduciaries (Count IV).

## JURISDICTION AND VENUE

9.     Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

3

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is a District where the Plan was administered, where breaches of fiduciary duty took place and/or where one or more Defendants reside or may be found.

## THE PARTIES

**Plaintiffs**

12.     **Plaintiff Eva L. Hanna** is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7) and maintained an investment in YRCW Stock in her individual account in that Plan during the Class Period.

13.     **Plaintiff Shelley F. Whitson** is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7) and maintained an investment in YRCW Stock in her individual account in that Plan during the Class Period.

14.     **Plaintiff Daniel J. Cambra** is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7) and maintained an investment in YRCW Stock in his retirement investment portfolio during the Class Period.

15.     **Plaintiff Patrick K. Couch** is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7) and maintained an investment in YRCW Stock in his retirement investment portfolio during the Class Period.

**Defendants**

**The Company**

16.     **Defendant YRCW** is a Delaware corporation with its principal office located at 10990 Roe Avenue, Overland Park, Kansas 66211.  YRCW is one of the largest transportation

service providers in the world.  YRCW is a holding company with the following wholly-owned operating subsidiaries (a) YRC National Transportation, (b) YRC Regional Transportation, comprised of the brands New Penn Motor Express ("New Penn"), Holland and Reddaway, (c) YRC Logistics, and (d) YRC Truckload ("Truckload") comprised of the brand Glen Moore.  YRCW is the Sponsor of the Plan and, upon information and belief as described more fully below, a fiduciary of the Plan.

### Director Defendants

17.     The Board of Directors of YRCW as a whole is responsible for appointing and monitoring the members of the Compensation Committee.  Pursuant to the Charter of the Compensation Committee of the Board of Directors of YRC Worldwide Inc., amended and restated July 26, 2007 (the "Compensation Committee Charter," attached hereto as Exhibit B), "The Board of Directors shall appoint the members of the [Compensation] Committee.  Each member of the Committee shall serve at the pleasure of the Board and may be replaced or removed by the Board at any time at its discretion."  Compensation Committee Charter at 1, YRCW-000796.

18.     **Defendant William D. Zollars** ("Zollars") served as Chairman of the Board during the Class Period.  Defendant Zollars is also the Chief Executive Officer ("CEO") of YRCW.

19.     The Compensation Committee of the Board of Directors of YRC Worldwide ("Compensation Committee") was a committee comprised of certain members of the YRCW Board of Directors which had the responsibility to "monitor the investment performance of the assets of qualified retirement plans and recommend any changes in investment policy" and to "review the Company's financial performance and approve contributions (and the allocation of the contributions), if any, to the Company's defined contribution plans."  Compensation Committee

Charter at 4, YRCW-000799.  The Compensation Committee was also responsible for appointing, and thus monitoring, the members of the Administrative Committee.  *Id.*.

20.     **Defendant Michael T. Byrnes** was a member of the Compensation Committee during the Class Period.  Defendant Byrnes was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

21.     **Defendant Cassandra C. Carr** was a member of the Compensation Committee during the Class Period.  Defendant Carr was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

22.     **Defendant Dennis E. Foster** was a member of the Compensation Committee during the Class Period.  Defendant Foster was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

23.     **Defendant Phillip J. Meek** was a member of the Compensation Committee during the Class Period.  Defendant Meek was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

24.     Defendants Zollars, Dennis E. Foster, Howard Dean, Cassandra Carr, William L. Trubeck, John C. McKelvey, Michael Byrnes, Mark A. Schultz, Phillip J. Meek and Carl W. Vogt ("Director Defendants") are the members of the YRC Board of Directors.

**Benefits Administrative Committee**

25.      **Defendant Benefits Administrative Committee ("Administrative Committee")** is

the Plan Administrator and Named Fiduciary of the Plan. Plan Document, Sec. 7.01, YRCW-

000052. Membership of the Administrative Committee is comprised of three or more members

which may include the (Executive) Vice President-Human Resources, Vice President (or Director) –

Employee Benefits, General Counsel, Chief Financial Officer, Treasurer and (Senior) Vice President

– Finance, YRC Inc. Charter of the Benefits Administrative Committee, YRCW-000801. The Vice

President (or Director) – Employee Benefits is the Chairman of the Administrative Committee *Id.*.

All members of the Administrative Committee are thus senior officers and employees of YRCW

who served on the Administrative Committee in the ordinary course of their employment, for no

additional compensation (Plan Document, Sec. 7.02(f)) and exercised authority or control over the

Plan, Plan assets and/or the Fund (Plan Document, Sec. 7.02(a)). As a result of their employment as

the Company's most senior officers, the Administrative Committee Members knew or should have

known all of the facts alleged herein and, in particular, the Company's perilous financial condition.

26.      **Defendant Harold D. Marshall ("Marshall")** is Vice President-Employee Benefits

of YRCW. Marshall is the Chairman of the Administrative Committee by virtue of his Company

position and as further evidenced by his signing the Plan's Form 11-K Annual Reports in his

capacity as "Chairman Benefits Administrative Committee." Marshall has been an Administrative

Committee member since January 1, 2006. Defendant Marshall was a fiduciary of the Plan, within

the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised

discretionary authority or control over Plan management and/or authority or control over

management or disposition of Plan assets.

27.    **Defendant James G. Kissinger ("Kissinger")** is YRCW (Executive) Vice President-Human Resources.  Kissinger has been a member of the Administrative Committee since January 2, 2008.  Defendant Kissinger was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

28.    **Defendant Daniel J. Churay ("Churay")** is YRCW General Counsel.  Churay has been a member of the Administrative Committee since January 1, 2006.  Defendant Churay was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

29.    **Defendant Sheila Taylor ("Taylor")** is YRCW Chief Financial Officer since October 2009.  Taylor has been a member of the Administrative Committee since June 25, 2009.  Defendant Taylor was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

30.    **Defendant Timothy A. Wicks ("Wicks")** was YRCW Chief Financial Officer until October 2009 and is currently the YRCW President and Chief Operating Officer (COO).  Wicks has been a member of the Administrative Committee since November 13, 2008.  Defendant Wicks was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

31.     **Defendant Phil Gaines ("Gaines")** is the YRCW Senior Vice President, Chief Accounting Officer. Gaines has been a member of the Administrative Committee since December 28, 2007. Defendant Gaines was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

32.     **Defendant James Staley ("Staley")** is or was the President of YRC Regional Transportation. Staley was a member of the Administrative Committee from January 1, 2006 to December 28, 2007. Defendant Staley was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

33.     **Defendant Steve Yamasaki ("Yamasaki")** was the YRCW Executive Vice President, Human Resources. Yamasaki was a member of the Administrative Committee from January 1, 2006 to January 5, 2008. Defendant Yamasaki was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

34.     **Defendant Steve Bruffett ("Bruffett")** was the YRCW Executive Vice President, Chief Financial Officer. Bruffett was a member of the Administrative Committee from September 1, 2007 to August 14, 2008. Defendant Bruffett was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

35.     **Defendant Christina Wise ("Wise")** was YRCW Vice President, Treasurer. Wise was a member of the Administrative Committee from January 10, 2008 to June 24, 2009. Defendant Wise was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

36.     **Defendant Paul F. Liljegren ("Liljegren")** is or was both the YRCW Treasurer and (Senior) Vice President – Finance. Upon information and belief, Liljegren is or was a member of the Administrative Committee by virtue of his Company position(s). Defendant Liljegren was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

37.     Defendants Marshall, Kissinger, Churay, Taylor, Wicks, Gaines, Staley, Yamasaki, Bruffett, Wise and Liljegren are, collectively, "Administrative Committee Members."

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action individually and on behalf of the Plan, and as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan, himself and a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of YRCW common stock (directly and/or through shares in the Fund) from October 25, 2007 to the present (the "Class").

39.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum,

thousands of members of the Class. The Summary Annual Report for the Yellow Corporation Retirement Savings Plan (the Plan's previous name) states that there were 16,927 participants in or beneficiaries of that plan on December 31, 2008.

40.     Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)     Whether Defendants were fiduciaries;

      (b)     Whether Defendants breached their fiduciary duties;

      (c)     Whether the Plan and the Participants were injured by such breaches; and

      (d)     Whether the Class is entitled to damages and injunctive relief.

41.     Plaintiffs' claims are typical of the claims of the other members of the Class, as Plaintiffs and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

42.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained able counsel with extensive experience in class action ERISA litigation. The interests of Plaintiffs are coincident with and not antagonistic to the interests of the other class members.

43.     Prosecution of separate actions by members of the class would create a risk of inconsistent adjudications with respect to individual members of the class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other

members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

44.     Questions of law and questions of fact which are common to the members of the class will predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this Complaint, taking into account:

   (a) the interest of members of the class in individually controlling the

   (b) prosecution or defense of separate actions;

   (c) the extent and nature of any litigation concerning the controversy

   (d) already commenced by or against members of the class;

   (e) the desirability or undesirability of concentrating the litigation of

   (f) claims in the particular forum; and

   (g) the difficulties likely to be encountered in the management of a

   (h) class action.

45.     Moreover, because the damages suffered by many of the Participants will be relatively small, the expense and burden of individually litigating their rights would make it impossible to redress the wrongs alleged herein individually.

## DESCRIPTION OF THE PLAN

46.     "The purpose of the Plan is to provide retirement security for eligible employees of the Employers.'" Plan Document, Preamble, YRCW-000003.

47.     Upon information and belief, the Plan's predecessor plans contained similar provisions. *See, e.g.*, Yellow Roadway Corporation Retirement Savings Plan as Amended and

Restated Effective January 1, 2005 ("Yellow Plan Document" attached hereto as Exhibit E),

Preamble at vi ("The purpose of the Plan is to provide retirement security for eligible employees of

the Employers…."); New Penn Plan SPD at 4, YRCW-000459 ("The Plan helps you save for

retirement….").

48.     The Summary Plan Description and Prospectus Dated March 1, 2007 for the YRC

Regional Transportation, Inc. 401(k) Retirement Plan (the "401(k) Plan SPD," attached hereto as

Exhibit C), explains the YRC Regional Transportation, Inc. 401(k) Retirement Plan is "designed to

help build financial security for your retirement and thereby to encourage you to make your career

with YRC Regional Transportation, Inc.," noting "[t]he principal purpose of the Plan is to promote

retirement savings among eligible employees of the participating employers." 401(k) Plan SPD at 1,

YRCW-000504. *See also* 401(k) Plan SPD at 7, YRCW-000510 ("As noted in Section I above, the

Plan helps you save for retirement….").

49.     The YRC Worldwide Inc. Defined Contribution Plans Investment Policy Formerly

Adopted for the Yellow Roadway Retirement Savings Plan, dated June 8, 2004 (the "Investment

Policy," attached hereto as Exhibit D) states "The Plan is designed to encourage and provide

employees with a tax-advantaged vehicle for use in building retirement savings." Investment Policy

at 1, YRCW-000787.

50.     At all times relevant to this Complaint, the Plan was an Employee Benefit Plan within

the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A), and an "Employee

Pension Benefit Plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A).

13

51.     The Plan was an "Eligible Individual Account Plan" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1 107(d)(3), and a "Qualified Cash or Deferred Arrangement Plan" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

52.     The Plan was a "Defined Contribution" and "Individual Account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

53.     The Plan was a voluntary contribution plan whereby Participants elected to contribute a portion of their compensation to the Plan ("Employee Contributions"). The Company also made contributions to the Plan on behalf of its employee Participants. ("Matching Contributions").

54.     Participants were able to make Employee Contributions as follows:

(a)     Election to make Pre-Tax Contributions. An Eligible Employee may elect, at the time and in the manner prescribed by the Administrative Committee, to make Pre-Tax Contributions to the Trust Fund of not less than 1%, nor more than 89%, of his Compensation for each payroll period, in 1% increments; provided, however, that in no event shall the sum of the Eligible Employee's Pre-Tax Contributions, After-Tax Contributions and Catch-Up Contributions exceed 89% of his Compensation for any payroll period. In applying this 89% limitation, an Eligible Employee shall in any event be eligible to make Pre-Tax Contributions and Catch-Up Contributions of at least 75% of his Compensation for any payroll period.

(b)     Automatic Pre-Tax Contributions. Notwithstanding (a) above or any other provision in this Plan to the contrary, if any Newly Hired Employee fails to make an affirmative election to make Pre-Tax Contributions to the Trust Fund of 0% or another specified percentage of Compensation per payroll period within one month of the later of (x) becoming an Eligible Employee, or (y) receiving from the Administrative Committee written notice of eligibility to participate in the Plan and the terms of this Section 3.01(b), he shall be deemed to have made an election to make Pre-Tax Contributions to the Trust Fund of 3% of his Compensation per payroll period.

    (c)     Section 3.01. After Tax Contributions. Subject to Section 3.01(b), an Eligible Employee may elect, at the time and in the manner prescribed by the Administrative Committee, to become a Participant by specifying the rate of After-Tax Contributions (in 1% increments) he wishes to make by payroll deduction. Such After-Tax Contributions shall not be less than 1%, not more than 15%, of his Compensation for each payroll period, provided, however, in no event shall the sum of the Eligible Employee's Pre-Tax Contributions, After-Tax Contributions and Catch-Up Contributions exceeds 89% of his Compensation for any payroll period.

Plan Document, Sec. 3.01, YRCW-000018 (emphasis original).

55.    The Plan's predecessor plans contained similar provisions. *See* Yellow Plan Document, Sec. 3.01(a), YRCW-000377; YRC Regional Transportation, Inc. 401(k) Retirement Plan as Amended and Restated Effective January 1, 2006 ("Regional Plan Document," attached hereto as Exhibit F), Sec. 3.2, YRCW-000302; Summary Plan Description and Prospectus Dated March 1, 2007 for the New Penn Motor Express, Inc. 401(k) Retirement Plan ("New Penn Plan SPD," attached hereto as Exhibit G), Sec. III.A., YRCW-000459.

56.    The Company made matching contributions to Participants' individual Plan accounts ("Matching Contributions") as follows:

    (a)     Matching Contributions. With respect to each designated matching period during the Plan Year, the Employer may contribute on behalf of each Participant an amount equal to a specified percentage of such Participant's Pre-Tax Contributions to the extent such contributions do not exceed a specified percentage of such Participant's Compensation attributable to such designated matching period. A "designated matching period" shall mean each payroll period during the Plan Year,

    (b)     Form of Matching Contributions. Matching Contributions shall be made in cash.

Plan Document, 4.01, YRCW-000024.

57.     The Plan's predecessor plans contained provisions detailing the Company's Matching

Contributions. *See* Yellow Plan Document, Sec. 4.01, YRCW-000383; Regional Plan Document,

Sec. 3.5, YRCW-000306; New Penn Plan SPD, Sec. III.B, YRCW-000461-462. However, under the

predecessor plans, Matching Contributions could take the form of Company stock. Yellow Plan

Document, Sec. 4.01(2), YRCW-000383 ("The Employers shall make Matching Contributions in

cash, Employer Stock or other property as the Company may determine"); Regional Plan Document,

Sec. 3.5(a)(1), YRCW-000306 ("An Employer may make Matching Contributions in cash, Company

Stock, property or any combination thereof.").

58.     The Company made discretionary contributions to Participants' individual Plan

accounts ("Discretionary Contributions") as follows:

> (a)     Employer Discretionary Contributions. With respect to each calendar quarter
> during a Plan Year, the Employer may make an Employer Discretionary
> Contribution to the Trust Fund in the amount as shall be determined by the
> Employer. Any such contributions shall be credited to the Employer
> Discretionary Contribution Accounts of Participants.
>
> (b)     Form of Employer Discretionary Contributions. Employer
>
> (c)     Discretionary Contributions shall be made in cash.

Plan Document, Sec. 4.02, YRCW-000024-25.

59.     The predecessor plans contained similar Discretionary Contributions provisions. *See*

Yellow Plan Document, Sec. 4.02, YRCW-000383; Regional Plan Document, Sec. 3.1, YRCW-

000301. However, under the predecessor plans, Discretionary Contributions could take the form of

Company stock. Yellow Plan Document, Sec. 4.02(b), YRCW-000383 ("The Employers shall make

Performance –Based Contributions in cash, Employer Stock or other property as the Company may

16

determine"); Regional Plan Document, Sec. 3.1, YRCW-000301 ("An Employer may make Company Contributions in cash, Company Stock, property or any combination thereof.").

60.     The Plan provided for the establishment of "Investment Funds." Plan Document, Sec. 1.40, YRCW-000010 and 5.03, YRCW-000029.   An "Employer Stock Fund" was an Investment Fund that "invested primarily: in YRCW common stock.   Plan Document, Sec. 1.32, YRCW-000008.

61.     The Administrative Committee selected Investment Funds for the Plan ("Investment Options") and had the authority to add or eliminate Investment Options – including the Fund – at its discretion, as follows:

> There shall be established within the Trust Fund Investment Funds selected by the Administrative Committee.  The Administrative Committee may add or eliminate Investment funds at its discretion, provided there are at least four Investment Funds, including the Employer Stock Fund.

Plan Document, Sec. 5.03, YRCW-000029.

62.     Similar provisions concerning Investment Options were contained in the predecessor plans.

> There shall be established within the Trust Fund Investment Funds selected by the Administrative Committee.  The Administrative Committee may add or eliminate Investment Funds at its discretion, provided there are at least four Investment Funds, including the Employer Stock Fund and, as described in subsection (b) below, the SCS Transportation Stock Fund.

Yellow Plan Document, Sec. 5.03(a), YRCW-000388.

> The Administrative Committee may establish separate Investment Funds, including the Company Stock Fund, in which assets of the Trust will be invested.

Regional Plan Document, Sec. 8.4(a), YRCW-000328.

63.     As explained in the Summary Plan Description and Prospectus Dated March 1, 2007

for the Yellow Roadway Corporation Retirement Savings Plan (the "Yellow Plan SPD," attached

hereto as Exhibit H), "[t]he Administrative Committee has the discretionary authority to interpret the

Plan and to make all other determinations necessary for the operation and administration of the

Plan." YRCW-000562. The New Penn Plan SPD has identical language. *See* New Penn Plan SPD

at 2, YRCW-000457. *See also* 401(k) Plan SPD at 2, YRCW-000505 ("The Administrative

Committee... has the power to resolve all questions arising in connection with the interpretation ,

administration, and application of the Plan.").

64.     Pursuant to its Charter, the Administrative Committee had a duty to:  (a) provide for

the diversification of plan investments, in its discretion . . ." (YRCW-000803); (b) "establish and

select the investment fund options for participant investment" (YRCW-00803); and (c) "establish an

investment policy for each investment fund and monitor the investment performance of each

investment fund in comparison to its investment policy" (YRCW-000803).

65.     Plan investments were governed by the Investment Policy adopted on June 8, 2004.

According to the Investment Policy,

> This policy is designed to provide a framework within which to
> manage the investments of the Trust which was established in
> accordance with the Yellow Corporation Retirement Saving Plan
> ("Plan") and is intended to constitute a funding policy under Section
> 402(b) of the Internal Revenue Code of 1986 (IRC).
>
> The Plan is designed to encourage and provide employees with a tax-
> advantaged vehicle for use in building retirement savings. . . .
>
> . . .
>
> The Board of Directors of Yellow Roadway Corporation (the
> "Board") recognizes that the assets in the Trust must be managed for
> the sole benefit of the Plan' participants and that a high level of care
> must be taken to insure that the funds offered for investment in the

18

Trust are selected prudently and in accordance with U. S. Department of Labor (DOL) regulations issued under ERISA section 404(a)(1). To exercise its responsibility the Board delegates the authority for the oversight and management of the Plan' investments within the parameters set forth below to the Yellow Roadway Corporation Benefits Administration Committee (the "Committee").

. . .

Assets must be managed with the care, skill, prudence and diligence that a prudent expert in similar circumstances would exercise. Assets must be invested solely for the benefit of participants and beneficiaries. Investment practices must comply with the limitations and restrictions of ERISA and any other applicable laws and regulations.

. . .

Acceptable investment options include but are not limited to the following:

. . .

Employer Stock Option

This option seeks to provide participants with an ownership interest in the company funded through employer contributions. This is a non-diversified Fund, and therefore, riskier than other well diversified equity options available under the Plan. The fund's value will fluctuate depending on performance, as well as, stock market fluctuations and general economic conditions. To provide liquidity for participants, a unitized stock fund will be used. The Board will establish a target cash balance after reviewing participant activity with the Trustee. The Trustee will monitor and manage the cash balance to the agreed upon target as outlined in Attachment A - Liquidity Contingency Plan for Unitized Stock Fund (subject to ERISA fiduciary limitations) on a daily basis and provide information to the Board at the quarterly meetings or on a more frequent basis as requested by the Board.

. . .

Monitoring Investment Options

> The Committee will review the investment performance of the
> selected investment options on a quarterly basis and fully review the
> investment options at least annually. . . .

Investment Policy, YRCW-000787-795.

66.     Moreover, the Compensation Committee, pursuant to its Charter, had the duty to

"monitor the investment performance of the assets of [the Plan] and recommend any changes in

investment policy. YRCW-000799.

67.     Subject to the duties outlined in the Investment Policy and other plan documents (as

well as fiduciary duties established by ERISA generally, set forth below), one of the Investment

Funds offered by Defendants for the Plan was the Employer Stock Fund.  However, effective

October 25, 2008, the Fund was "frozen" with respect to future Employee Contributions.  Plan

Document, Sec. 5.03(c), YRCW-000030.

68.     As of January 1, 2009, Employee Contributions were invested among the Investment

Options as follows:

> (a)     Investment of Future Contributions. A Participant shall direct the investment
> of future Contributions made by him and on his behalf, in 1% increments
> among the Discretionary Investment Funds [excluding the Employer Stock
> Fund]. A Participant's investment direction shall be submitted to the
> Administrative Committee at the time and in the manner prescribed by the
> Administrative Committee and subject to the limitations and terms applicable
> to the Discretionary Investment Funds as those limitations and terms are
> described in the Investment Fund's prospectus or other governing documents
> in the absence of any investment direction, the Participant's Contributions
> shall be invested in the Discretionary Investment Fund designated by the
> Administrative Committee as the default Discretionary Investment Fund.
>
> (b)     Change of Investment for Future Contributions. A Participant may elect to
> change the investment of his future Contributions, in 1% increments among
> the Discretionary Investment Funds. Any investment direction by the
> Participant shall be submitted to the Administrative Committee, at the time
> and in the manner prescribed by the Administrative Committee and subject to
> the limitations and terms applicable to the Investment Fund, as those
> limitations and terms are described in the Investment Fund's prospectus or
> other governing documents.

(c)     Change of Investment for Current Accounts. A Participant may elect to change the investment of the combined balances in his Accounts, in 1% increments among the Discretionary Investment Funds -- (other than a brokerage account). Any Participant election to change the investment of his account balance shall be submitted to the Administrative Committee, at the time and in the manner prescribed by the Administrative Committee, and subject to the limitations and terms applicable to the Investment Fund, as those limitations and terms are described in the Investment Fund's prospectus or other governing documents.

(d)     Change of Investment in Employer Stock Fund. A Participant may elect at any time to have all or any portion of his Accounts invested in the Employer Stock Fund transferred from the Employer Stock Fund to one or more Discretionary Investment Funds. However, a Participant may not elect to have the transferred portion transferred back to the Employer Stock Fund.

Plan Document, Sec. 5.04, YRCW-000030-31.

## DEFENDANTS WERE FIDUCIARIES

69.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan

because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

70.     In that regard, a person is a fiduciary even if a plan does not name him as such or by

its terms assign fiduciary duties to him where by his conduct he engages in fiduciary activities. The

21

test for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

71.    A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

**Defendant Benefits Administrative Committee**

72.    The Administrative Committee was the Plan Administrator and the Named Fiduciary of the Plan. Plan Document, Sec. 7.01, YRCW-000051. The Administrative Committee had and exercised fiduciary authority or control over the management and disposition of the Plan's assets, including selecting and monitoring the prudence of Plan Investment Options, including the Fund and the Fund's investment in YRCW Stock. Plan Document, Sec. 5.03, YRCW-000029.    The Administrative Committee had the ability and fiduciary responsibility to prepare and disseminate written communications to Participants containing information to be used by Participants in managing their Plan investments, such as investing in the Fund. Administrative Committee Charter, Para. A(4), B(2), YRCW-000802-3.

73.    The Administrative Committee selected Investment Funds for the Plan ("Investment Options") and had the authority to add or eliminate Investment Options – including the Fund – at its discretion, as follows:

>            There shall be established within the Trust Fund Investment Funds
>            selected by the Administrative Committee. ***The Administrative***

22

> ***Committee may add or eliminate Investment funds at its discretion***,
> provided there are at least four Investment Funds, including the
> Employer Stock Fund.

Plan Document, Sec. 5.03, YRCW-000029 (emphasis added).

74.     Similar provisions concerning Investment Options were contained in the predecessor

plans.

> There shall be established within the Trust Fund Investment Funds
> selected by the Administrative Committee. ***The Administrative
> Committee may add or eliminate Investment Funds at its discretion***,
> provided there are at least four Investment Funds, including the
> Employer Stock Fund and, as described in subsection (b) below, the
> SCS Transportation Stock Fund.

Yellow Plan Document, Sec. 5.03(a), YRCW-000388 (emphasis added).

> The Administrative Committee ***may*** establish separate Investment
> Funds, including the Company Stock Fund, in which assets of the
> Trust will be invested.

Regional Plan Document, Sec. 8.4(a), YRCW-000328 (emphasis added).

75.     As explained in the Yellow Plan SPD, "[t]he Administrative Committee has the

discretionary authority to interpret the Plan and to make all other determinations necessary for the

operation and administration of the Plan." Yellow Plan SPD at 2, YRCW-000562. The New Penn

Plan SPD has identical language. *See* New Penn Plan SPD at 2, YRCW-000457. *See also* 401(k)

Plan SPD at 2, YRCW-000505 ("The Administrative Committee… has the power to resolve all

questions arising in connection with the interpretation, administration, and application of the Plan.").

76.     Consequently, in light of the foregoing powers, duties, responsibilities, and actions,

the Administrative Committee was both a named fiduciary of the Plan pursuant to ERISA §

402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary within the meaning of ERISA § 3(21), 29

U.S.C. § 1002(21), in that it exercised discretionary authority or discretionary control with respect to

management of the Plan, exercised authority or control with respect to management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**Defendants Marshall, Kissinger, Churay, Taylor, Wicks, Gaines, Staley, Yamasaki, Bruffett, Wise and Liljegren**

77.    The Administrative Committee Members were fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because, as members of the Administrative Committee they exercised authority or control with respect to management of the Plan, exercised authority or control with respect to management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan, as more fully described above.

**Defendant YRC Worldwide**

78.    Instead of delegating fiduciary responsibility for the Plan to external service providers, the Company chose to internalize certain vital aspects of this fiduciary function.

79.    The Company acted through the Board, the Compensation Committee, the Administrative Committee and certain other officers and employees. The Company had, at all applicable times, effective control over the activities of its officers and employees, including over their Plan-related activities. The Board had the authority and discretion to hire, appoint, monitor, and remove the members of the Administrative Committee, as well as other officers and employees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

80.    By failing to properly discharge their fiduciary duties under ERISA, the employee and officer defendants, including the Administrative Committee Defendants, breached fiduciary duties they owed to the Plan, their participants and their beneficiaries. Such individuals were appointed by

the Company to perform Plan-related fiduciary functions in the course and scope of their employment. Accordingly, the actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior*, and the Company is liable for these actions.

81. Thus, Defendant YRCW is a fiduciary because, upon information and belief, YRCW actually managed, administered and operated the Plan, exercised authority or control over the management and disposition of the Plan's assets and disseminated the Plan communications to Participants. In particular:

> (a) YRCW had authority to direct the Trustee and in fact did direct the Trustee concerning the investment of Plan assets. *See* Trust Agreement Between Yellow Corporation and Fidelity Management Trust Company ("Trust"), YRCW-000726 (YRCW directing trustee to liquidate balances in certain investment options and transfer to others), YRCW-000752-6 (same), YRCW-000764-5 (same).

> (b) YRCW had the exclusive authority to direct the Trustee as to the proportion of the Fund that would be held in cash and the proportion that would be held in YRCW Stock. Trust, Sec. 4(f), YRCW-000627.

> (c) YRCW, through its treasury, human resources, and legal departments, directed the Plan Trustee concerning the investment of Plan assets. *See* Trust, YRCW-000713 (designating William Martin [corporate Secretary], Lawrence Berkowitz and Harold Marshall as individuals authorized to direct the Trustee).

25

(d)     Upon information and belief, the Administrative Committee met infrequently and spent very little time on matters relating to administration of the Plan and the Plan's investments. Rather, upon information and belief, these jobs were performed by YRCW's employees acting in the scope of their day-to-day duties and, in particular, by YRCW's human resources, legal, corporate communications, finance and treasury personnel. Upon information and belief, YRCWs employees monitored Plan investments and communicated with Participants concerning Plan investments and investment risk and return characteristics, including the Fund.

(e)     The Administrative Committee Members were selected and served solely as a function of their corporate positions. Benefits Administrative Committee Charter, YRCW-000801 (committee membership defined by title of corporate officers) comprised of three or more people holding five designated corporate officers). They served without any compensation outside of their regular employment with the Company. Plan Document, Sec. 7.02(f). Thus the Administrative Committee members served on the Administrative Committee as part of and in the ordinary course of their job responsibilities and, accordingly, the Company is responsible and liable for their actions.

**Defendants Michael T. Byrnes, Cassandra C. Carr, Dennis E. Foster & Phillip Meek**

82.     The Compensation Committee Members were fiduciaries because they had responsibility to appoint and monitor the members of the Administrative Committee. Additionally, as set forth above, they had responsibility to monitor the Plan Investment Option performance and

recommend changes in investment policy. Thus, in addition to appointment fiduciaries, the Compensation Committee Members were also fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised authority or control with respect to management or disposition of the Plan's assets.

**Director Defendants Zollars, Foster, Dean, Carr, Trubeck, McKelvey, Byrnes, Schultz, Meek and Vogt**

83.     The Director Defendants were fiduciaries because they appointed the members of the Compensation Committee which, as set forth above, had authority over Plan investments. In particular, they had the duty to determine the investment composition of the Fund.

**Defendant Zollar**

84.     Defendant Zollar was a fiduciary because, upon information and belief, he exercised authority and control over the Plan and the Plan's investments, including the Plan's investments in the Fund. This was done by, upon information and belief, through direct or indirect control over the Administrative Committee, its members, and other YRCW employee working on the Plan because they acted at his direction as the Company's CEO. Consequently, in light of the foregoing duties, responsibilities, and actions, Zollar, as the Company's CEO, was a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that he exercised discretionary authority or discretionary control with respect to management of the Plan, exercised authority or control with respect to management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

### ADDITIONAL FIDUCIARY ASPECTS OF DEFENDANTS' ACTIONS/INACTIONS

85.     **The Statutory Requirements.** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

86.   **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty--that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

87.   The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

88.   **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence--that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

89.   **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail:  (1) a negative duty not to misinform; (2) an affirmative duty to

inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

90.      Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. Defendants were required to furnish the Summary Plan Description ("SPD") and a Prospectus to Participants. The SPD, the Prospectus and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b). Here, Defendants purported to make that required disclosure concerning the Fund by incorporating by reference into the Plan's Prospectus and/or SPD, all of YRCW's filings

under Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange Act, as well as listing specific

documents filed by YRC or the Plan with the SEC.  *See* Yellow Plan SPD at 45, YRCW-000605;

401(k) Plan SPD at 39, YRCW-000542; New Penn Plan SPD at 31, YRCW-000486.

91.     The Plan Documents further informed participants that "YRC's most recent annual

report is available via the Internet at www.YRC.com."  *See* Yellow Plan SPD at 45, YRCW-000605;

401(k) Plan SPD at 39, YRCW-000542; New Penn Plan SPD at 31, YRCW-000486.

92.     Further, Defendants, as the Plan's fiduciaries, knew or should have known certain

basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the

401(k) literature and the trade press, concerning investments in company stock, including that:

- Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

- Out of loyalty, employees tend to invest in company stock;

- Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

- Employees tend not to change their investment option allocations in the plan once made;

- No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

- Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

- Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.[2]

---

2 *See, e.g.*, Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/ pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_ 116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the importance of plans design*, Finance and

93.     Even though Defendants knew or should have known these facts, and even though

Defendants knew of the substantial investment of the Plan's funds in Company Stock, they took no

action to protect the Plan's assets from imprudent investment in Company Stock.

94.     **The Duty to Investigate and Monitor Investment Alternatives.** With respect to a

pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an

independent investigation into, and continually to monitor, the merits of the investment alternatives

in the Plan including employer securities, to ensure that each investment is a suitable option for the

Plan.

95.     **The Duty to Monitor Appointed Fiduciaries**.   Fiduciaries who have the

responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus

appointed. The duty to monitor entails both giving information to and reviewing the actions of the

appointed fiduciaries.  In a 401(k) plan such as the Plan the monitoring fiduciaries must therefore

ensure that the appointed fiduciaries:

> (a)     possess the needed credentials and experience, or use qualified advisors and
> service providers to fulfill their duties;
>
> (b)     are knowledgeable about the operations of the Plan the goals of the Plan and
> the behavior of Plan's participants;
>
> (c)     are provided with adequate financial resources to do their jobs;
>
> (d)     have adequate information to do their jobs of overseeing the Plan's
> investments with respect to company stock;
>
> (e)     have access to outside, impartial advisors when needed;

---

Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at:
http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

      (f)    maintain adequate records of the information on which they base their decisions and analysis with respect to Plan's investment options; and

      (g)    report regularly to the monitoring fiduciaries.

      (h)    the monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

96.    **The Duty Sometimes to Disregard Plan Documents**. A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result or if such is the result of a lack of loyalty. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

97.    **Co-Fiduciary Liability**. A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

98.     **Non-Fiduciary Liability**.  Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## SUBSTANTIVE ALLEGATIONS

99.     YRCW is one of the largest transportation service providers in the world.  The Company specializes in the heavyweight shipping of industrial, commercial, and retail goods in national, regional, and international markets.  YRCW is the holding company for a portfolio of brands including YRC, YRC Reimer, YRC Glen Moore, YRC Logistics, New Penn, Holland and Reddaway.

100.    Throughout the Class Period, the YRCW's financial condition deteriorated to a state in which the Company was on the brink of bankruptcy.  During this time period, YRCW's debt to equity ratio increased to excessive levels and, as set forth below, rendered further investment in the Fund imprudent.  In addition, all three major credit rating agencies dramatically cut YRCW's ratings, from at or near "Investment Grade" to the verge of "Default."

101.    The Company's financial condition, when viewed through the lens of objective financial formulas, plainly indicated that YRCW was not a prudent retirement investment.

**YRCW Suffers Financial Distress**

102.    YRCW faced significant competitive challenges which substantially increased the risk of investment in the Company.  Beginning at least by 2007, the demand for goods shipped on U.S. highways declined dramatically, as compared to very strong demand levels in 2005 and the first half of 2006.  The decline in demand was largely due to the slowing U.S. economy faced with waning residential construction, increasing energy costs, declining retail sales, falling home prices and

shrinking credit markets. Each of these factors, negatively affected demand for shipping and dramatically increased the business risks at the Company.

103.    On October 25, 2007, the first day of the Class Period, YRCW announced that the Company's performance was negatively impacted by a declining market:

> "The weak domestic shipping market continues to significantly impact the operating performance of all our companies," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "YRC National Transportation and YRC Logistics have responded aggressively to the difficult operating environment and their results compare favorably to overall industry performance. YRC Regional Transportation faced additional challenges from consumer mix and integration issues, and as a result, performed well below expectations. We are taking appropriate actions to address these performance issues."
>
> YRC Worldwide reported the following consolidated results for the third quarter 2007:
>
> Operating income was $88 million compared to operating income of $178 million in 2006.

104.    At the same time, Zollars assured the public that YRCW was taking action to "redress these performance issues." YRCW also announced that operating income for the quarter was $88 million, as compared to $178 million for the third quarter of 2006. On this day, YRCW Stock closed at **$25.96 per share.**

105.    At the end of third quarter of 2007, YRCW's debt to equity ratio was 2.53. *The Company's debt was two and a half times more than its equity.*

106.    On December 13, 2007, Standard & Poor's Rating Services ("S&P") reduced its corporate credit ratings on YRCW to junk status.[3] In particular, the Company's rating was lowered

---

[3]    Credit ratings issued by the three main credit rating agencies, Standard & Poor's Rating Services ("S&P"), Moody's and Fitch, are commonly used by investment professionals, including fiduciaries, to evaluate investment risk and/or the likelihood an entity will default or file bankruptcy. *See* Report on the Role and Function of Credit Rating

34

to BB+ from BBB-. Under S&P's guidelines, a "BBB-" rating is provided to corporate credit that is "Non Investment grade" or "Speculative." In connection with the downgrade, S&P stated "[t]he rating actions reflect worse-than-expected financial performance and operating profitability, weak credit metrics, and concerns regarding YRC's near-term operating outlook." According to S&P, the Company's outlook was "negative."

107.    By the end of 2007, YRCW had suffered three consecutive quarters of declining operating income.

108.    The Altman Z-Score ("Z-Score"), developed in 1968 by Professor Edward I. Altman of the Stern School of Business at New York University, is a bankruptcy prediction model commonly accepted and used by financial analysts for predicting the likelihood of a company filing for bankruptcy. *See National Wildlife Federation v. EPA*, 286 F.3d 554, 565-66 (D.C. Cir. 2002) (upholding Federal agency's use of the Altman Z-score bankruptcy analysis, finding that it "has been quite accurate over these last 25 years and remains an objective, established tool") (internal quotes and citations omitted).

109.    A Z-Score greater than 2.99 is the "safe zone" – meaning a company is unlikely to go bankrupt; a score of 1.88 to 2.99 is a the "grey zone" and a score less than 1.88 is the "distress zone" where there is a high probability the company will go bankrupt within two years.

110.    As of December 31, 2007, YRCW's Z-Score was 2.9385. The Company fell out of the "safe zone" it had consistently occupied and into the "grey zone" indicating that the Company had a greater probability of bankruptcy. In addition, YRCW's debt to equity ratio rose to 3.55.

---

Agencies in the Operation of the Securities Markets, As Required by Section 702(b) of the Sarbanes-Oxley Act of 2002, U.S. Securities and Exchange Commission, January 2003, p. 5 (recognizing the central role of credit ratings; "Today, credit ratings affect securities markets in many ways, . . . including the ability of fiduciaries and others to make particular investments").

111.    On January 2, 2008, YRCW filed a Form 8-K announcing that it expected to incur non-cash impairment charges during the fourth quarter of 2007 relating to prior acquisitions in the pre-tax range of $700 to $800 million ($650 to $750 million after taxes).

112.    On January 3, 2008, Fitch lowered YRCW's Bank Loan Debt Rating and Senior Unsecured Debt Rating to junk status.   The ratings were lowered from BBB- to BB+ (Non-investment Grade Speculative).

113.    On this day, YRCW Stock closed at $13.82 per share, an almost **50% drop** in a **two and one-half month period** of time.

114.    On January 28, 2008, YRCW announced its results for the fourth quarter of 2007. Including the previously reported impairment charge, "full-year 2007 results were a loss per share of $11.17 compared to EPS of $4.74 in 2006."  In connection with the dismissal results, the Company's CEO Defendant Zollars stated:

> "The economic environment was challenging throughout 2007 and it was increasingly so in the fourth quarter," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Looking forward, we expect the first quarter to also be difficult given it is seasonally the softest and we don't anticipate the economy improving in the near term. As the largest less-than-truckload provider, we are well positioned to benefit from economic recovery, when it occurs."

115.    On February 7, 2008, YRCW filed a Form 8-K announcing that their subsidiaries, USF Holland and USF Reddaway, would be closing certain service centers within their service territories.

116.    On February 21, 2008, S&P lowered YRCW's corporate credit rating from BB+ to BB.

117.    On April 18, 2008, the Company announced that it had entered an Amendment to its Credit Agreement in connection with its senior revolving credit facility. The amendment would effectively increase YRCW's annual interest expense $1.5 million and $4 million. The announcement stated that the Amendment:

> increases the interest rates and fees applicable to the revolving credit facility and term loan as set forth in the definition of "Applicable Rate" in Section 1.01 of the Credit Facility; effective with this amendment, the interest rate on amounts outstanding under the revolving credit facility and term loan is LIBOR plus 100 basis points and LIBOR plus 125 basis points, respectively, and the facility fee for the revolving credit facility is 25 basis points; the Company expects interest expense to increase $1.5 – 4.0 million annually with this amendment . . .

118.    On April 21, 2008, YRCW suffered additional reductions in its credit ratings. Fitch lowered the Company's Senior Unsecured Debt rating from BB+ to BB. Moody's lowered its Senior Unsecured Debt rating from Ba1 to Ba3. Moody's also lowered YRCW's Probability of Default Rating from Ba1 to Ba2, indicating a greater probability that YRCW would face bankruptcy.

119.    On April 24, 2008, the Company announced its earnings for the first quarter of 2008. YRCW suffered a loss per share of $.81 per share:

> "YRC Worldwide Inc. (NASDAQ: YRCW) today announced a first quarter 2008 loss per share of $.81, including previously announced reorganization charges related to USF Holland and USF Reddaway of $.13 per share and losses on property disposals of $.02 per share."

As of the quarter ended March 31, 2008, the Company's debt to equity ratio was 4.59, indicating that total liabilities were over four and one-half times equity.

120.    On July 24, 2008, YRCW announced its earnings for the second quarter of 2008. The Company announced that it had "diluted earnings per share of $.62 for the second quarter 2008,

including a previously announced curtailment gain of $.39 per share and charge of $.09 per share for

significant claim activity.

121. On September 8, 2008, Fitch lowered YRCW's Senior Unsecured Debt from BB to

BB- (Non-investment Grade Speculative).

122. As of September 30, 2008, the Company's debt to equity ratio had risen to 4.60.

123. On October 3, 2008, the Company announced that it had borrowed $325 million from

its senior revolving credit to pay down senior notes:

> YRC Worldwide Inc. (NASDAQ: YRCW) announced today that on October 2, 2008 the company drew down $325 million on its senior revolving credit facility, which matures August 17, 2012. The company plans to use the funds to redeem all of the outstanding $225 million 8.25% senior notes due December 1, 2008 and its entire outstanding $100 million 6.5% senior notes due May 1, 2009. The redemption of the notes is scheduled for November 3, 2008.
>
> "Given the unrest in the credit markets, we believe it is in the best interest of YRC to satisfy these maturities early," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Our current financial condition is solid; and with no further note maturities until 2010, we are well positioned to weather this economic environment."
>
> As the note redemptions and the draw on the senior revolving credit facility will occur in the same quarterly reporting period, the company does not expect these specific actions to have an affect on its aggregate outstanding indebtedness at the end of the fourth quarter 2008. The company expects to remain in full compliance with all terms of its credit agreement. After taking into account the October 2, 2008 draw, the company has nearly $400 million of borrowing capacity remaining under its credit facilities. In addition, these redemptions will satisfy all of the company's significant maturities through March 2010.

124. By October, 2008, YRCW Stock price dropped dramatically. In an attempt to stem

the stock price decline, the Company reaffirmed its cash flow.

> YRC Worldwide Inc. (NASDAQ: YRCW) today reaffirmed that it expects to have positive free cash flow in both the third and fourth

quarters of 2008 with a significant debt reduction for the year. In addition, the company expects to remain in full compliance with all terms of its credit agreement, including the leverage ratio.

"With more than $9 billion in annual revenue and comprehensive networks in the national and regional markets, we continue to provide excellent service to our customers each and every day," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Despite the continuing unrest in the broad financial markets, our current financial position is solid and we remain well positioned to weather this economic environment."

125.    On October 14, 2008, Fitch lowered YRCW's Bank Loan Debt Rating from BBB- to

BB+ and its Senior Unsecured Debt Rating from BB- to CCC+.  With respect to Senior Unsecured

Debt, the rating indicated that YRCW had "substantial risks" of default.

126.    In October 23, 2008, YRCW announced its earning for the third quarter of 2008.  The

Company stated:

> YRC Worldwide Inc. (NASDAQ: YRCW) today announced diluted earnings per share of $.63 for the third quarter of 2008, including a previously announced curtailment gain of $.84 per share and gains on property disposals of $.21 per share. The quarter also included charges of $.10 per share related to reorganization costs. In the third quarter of 2007, the company reported $.70 of diluted earnings per share. The third quarter 2008 results do not reflect any potential impairment charges that may result from the tests the company is currently performing, as announced on October 8, 2008. If an impairment charge is required, the charge will be non-cash in nature and excluded from the calculation of the leverage ratio in determining the company's compliance with the leverage ratio limitation under its credit and asset backed securitization facilities.
>
> YRC Worldwide generated $52.2 million of cash from operating activities during the quarter and, when taking into account the $40.4 million of cash inflow from net capital expenditures, third quarter free cash flow was $92.6 million. The company's leverage ratio of total debt to trailing twelve months earnings before interest, taxes, depreciation and amortization, or EBITDA, (as those terms are defined in the company's credit facilities) was 3.18 times against a limit of 3.75 times for the third quarter 2008. As of December 31, 2008, through the remaining term of the credit facilities, the leverage

ratio limitation is 3.5 times. Total balance sheet debt was reduced by $11.4 million for the third quarter and $50.3 million since December 31, 2007.

"Throughout the third quarter, the operating environment progressively weakened resulting in lower than expected volumes and more competitive pricing," stated Bill Zollars Chairman, President and CEO of YRC Worldwide. "Although the economy slowed more than we expected during the quarter, we still generated solid free cash flow and paid down debt, in addition to removing significant cost from our business," Zollars added.

127.    On November 12, 2008, YRCW suffered another credit rating reduction. Moody's lowered the Company's Senior Unsecured Debt rating from Ba3 to B2. Moody's also lowered YRCW's Probability of Default Rating from Ba2 to B1, indicating that YRCW default rating was "Highly Speculative."

128.    On November 19, 2008, S&P lowered YRCW's corporate credit rating from BB to B, indicating that YRCW's credit was highly speculative.

129.    On November 20, 2008, the Company announced that -- as a result of significant downgrades in its credit -- it would be forced, under the terms of its credit agreements, to collateralize certain assets. YRCW announced:

YRC Worldwide Inc. (NASDAQ: YRCW) announced today the financial impact of yesterday's credit rating change from S&P. The credit rating is considered a trigger event under the credit agreement. This trigger event requires the company to collateralize its remaining unencumbered assets, which primarily include its real estate and revenue equipment. The company estimates the market value of these assets to be around $1.5 billion.

130.    On December 3, 2008, the Company announced that it had negotiated concessions from the International Brotherhood of Teamsters to modify the current labor agreement. The Teamsters agreed to a 10% reduction in all wages. The Company reported:

40

Bill Zollars, Chairman, President and CEO of YRC Worldwide, commented, "During this economic recession, we have already taken a number of steps to improve our financial and competitive position, as we continue aggressive short-term actions to meet the current environment as we plan for our long-term success. We are in the process of working with our union partners to modify the terms of our labor contract in a way that allows us to be more competitive with non-union carriers in the short-term and, at the same time, protect and sustain the financial health of our dedicated employees and our company going forward."

Zollars continued, "This modification would address our operating cost structure, which is higher than a number of companies in our industry, due primarily to pension plan funding obligations. Funding pensions for our own Teamsters employees is affordable; however, paying for all the retirees and former employees of failed companies as required under our current plans makes us less competitive."

While working on a longer-term solution to this issue, YRC Worldwide is seeking immediate cost savings through proposed changes for the remainder of the contract including:

- 10 percent reduction in all wages paid, inclusive of scheduled increases

- Suspension of Cost of Living Adjustments (COLA)

131.    On December 4, 2008, S&P lowered YRCW's corporate credit rating from B to CC indicating that YRCW's credit was extremely speculative. The following day, Moody's lowered the Company's ratings to Ca indicating that the Company was in default with little prospect for recovery.

132.    On December 31, 2008, YRCW Z-Score suffered a dramatic decline to 1.9608 indicating that the Company was operating in the lower depths of the "grey zone" with a much greater probability of bankruptcy.

133.    On January 8, 2009, the Company announced "that its union employees represented by the International Brotherhood of Teamsters have voted overwhelmingly to modify the current

41

labor agreements for the company's Yellow Transportation, Roadway, Holland and New Penn

business units." The Company further announced:

> The modified contract included a 10 percent reduction in all wages
> paid, inclusive of scheduled increases, and the suspension of cost of
> living adjustments (COLA) for the remaining life of the contract. In
> exchange, Teamsters employees will receive a 15 percent ownership
> stake in YRC Worldwide, allowing them to share in future company
> performance. Contributions to the health, welfare and pension plans
> will continue as previously negotiated.

134.    On January 9, 2009, Fitch lowered YRCW's Bank Loan Debt Rating from BB to B

and its Senior Unsecured Debt Rating from CCC+ to C, indicating that the company was on the

verge of default.

135.    On January 29, 2009, YRCW announced its earnings for the fourth quarter of 2008.

The Company announced:

> YRC Worldwide Inc. (NASDAQ: YRCW) today announced a loss
> per share for the fourth quarter 2008 of $1.63, excluding impairment
> charges of $2.51 per share, and for the full year 2008 a loss per share
> of $1.22, excluding impairment charges of $15.70 per share. When
> including impairment, the fourth quarter loss was $4.14 per share
> compared to a loss of $12.99 per share in the fourth quarter of last
> year and a full year loss of $16.92 per share compared to a full year
> loss of $11.17 per share in 2007. The fourth quarter impairment
> charge consisted of $141 million related to the Roadway trade name
> as the company introduced a new YRC brand for the integrated
> network of Yellow Transportation and Roadway. The impairment
> charge also included goodwill of $59 million at YRC Logistics.

136.    On February 18, 2009, Fitch lowered YRCW's Bank Loan Debt Rating from B to B-.

137.    On March 9, 2009, YRCW announced a cut of approximately 2000 jobs.

138.    On March 31, 2009, YRCW's financial condition had fallen into the distress zone.

The Company's Z-score was 1.4302 which indicated that bankruptcy was likely. Moreover, as of

March 31, 2009, the Company's debt to equity ratio had risen significantly to 12.99 -- indicating that

YRCW's **total liabilities were nearly thirteen times the value of the Company's equity**.

139.    On April 7, 2009, YRCW's stock price dropped 27% the largest decline in six

months after reporting an "accelerated" decline in shipping volumes in the first quarter. With respect

to YRCW's dramatic price drop Bloomberg reported:

> YRC Worldwide Inc., the biggest U.S. trucking company, fell the
> most in six months in Nasdaq trading after reporting an "accelerated"
> decline in shipping volumes.
>
> * * * *
>
> Nationwide cargo volume declined 29 percent in the first quarter from
> a year earlier because of the weak economy and the company's
> initiatives to reduce costs, according to a slide presentation for
> delivery by Chief Financial Officer Timothy Wicks at an analyst
> meeting.  The presentation was filed with the U.S. Securities and
> Exchange Commission.

140.    On April 23, 2009, YRCW announced its earnings for the first quarter of 2009. The

Company announced:

> YRC Worldwide Inc. (NASDAQ: YRCW) today announced a loss
> per share for the first quarter 2009 of $2.63, excluding significant
> charges as listed below, and a loss per share of $4.34 when including
> the charges. The company's loss per share in the first quarter of 2008
> was $.82.
>
> We made significant investments in our company during the first
> quarter to enhance our position in the market and improve our future
> operating performance," stated Bill Zollars, Chairman, President and
> CEO of YRC Worldwide. "Unfortunately, the economy progressively
> weakened throughout the quarter making it more challenging to get
> ahead of the volume declines. With that said, the March 1 integration
> of our national networks allowed us to remove substantial capacity
> and reset the volume needs of our network, while significantly
> enhancing our service offering to the customer."

141.   On June 18, 2009, YRCW's financial circumstances grew even worse as it struggled

to make its pension contribution payments.  The Company announced that it was forced to provide

its real estate as collateral in lieu of making pension contributions:

> YRC Worldwide Inc. (NASDAQ: YRCW) announced today that it
> has finalized an agreement with Central States, Southeast and
> Southwest Areas Pension Fund ("Central States") in which the
> company will provide certain of the company's real estate as
> collateral in lieu of making pension contribution payments during the
> second quarter. The estimated combined contribution payment
> deferral to Central States is approximately $83 million. The
> agreement calls for the company to repay the deferred contributions
> over three years beginning in January 2010.
>
> * * * *
>
> In addition, YRC Worldwide announced that it finalized an
> amendment to its credit agreement with its lenders that permits the
> company and its subsidiaries to grant second priority liens on certain
> owned real estate in conjunction with the pension deferrals described
> above. The amendment also releases escrow funds of $73 million,
> generated from the company's prior real estate transactions, to pay
> down the revolving credit facility without reducing the company's
> borrowing availability under the facility.

142.   On June 30, 2009, YRCW's reported its earnings for the second quarter of 2009.  The

Company stated:

> YRC Worldwide Inc. (NASDAQ: YRCW) today reported its results
> for the second quarter and provided an update on its comprehensive
> plan. For the quarter, the company announced a loss per share of
> $3.53, excluding significant charges as detailed below, and a loss per
> share of $5.20 when including the charges. By comparison, the
> company reported earnings per share in the second quarter of 2008 of
> $.23, when excluding a curtailment gain related to the harmonization
> of retirement plans across the company for its non-contractual
> employees, and earnings per share of $.62 when including the
> curtailment gain.
>
> "The second quarter was focused on executing our comprehensive
> plan to realize efficiencies from the YRC integration, restore financial
> strength and position our operating companies for future success,"

stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "As a result of the March integration of Yellow and Roadway, the further rightsizing of our networks in relation to volumes and the overall economic environment, we recorded some significant charges that we believe are not reflective of the underlying operating results of our company. Although we will continue to enhance the efficiencies of our networks, we do not expect to record charges of this magnitude going forward."

* * * *

"We continue to win new business, and customers have returned shipments to our networks, though it has not happened as quickly or at the levels we were initially expecting," said Zollars. "Although misinformation about our financial stability creates noise in the marketplace, many of our key customers stand firmly behind our plans and show their support with their business every day. We believe that as we continue to make significant progress on our plans, the tremendous support of our employees, lenders and other stakeholders can provide all of our customers with the confidence they need to completely return."

143. As of the end of second quarter of 2009, the Company's debt to equity ratio rose excessively to 33.89. More significantly, on June 30, 2009, YRCW's Z-score plummeted to 0.5819 indicating an even higher probability of bankruptcy.

144. On July 15, 2009, RW Baird stated that YRCW would likely declare bankruptcy within the year, in part because of unaddressed issues such as volume contractions, aggressive pricing, and accelerating core operating losses.

145. On this day, YRCW Stock closed at $1.55 per share.

146. On August 12, 2009, Stifel Nicolaus ("Stifel"), the investment advisory firm, downgraded YRCW from Hold to Sell. Stifel observed that it was becoming increasingly likely that YRCW will go bankrupt. Stifel stated that YRCW's frequent need to amend credit agreements and failure to meet low cash flow and earnings expectations suggests there's no turnaround coming.

Further, Stifel stated that the Teamsters concessions did not amount to a long-term fix.  Analyst David Ross of Stifel noted:

> While we have tried to be more constructive on YRC, as many have piled on the bankruptcy bandwagon, and have looked for ways the company could survive, the seemingly constant need to amend its credit agreements and continued failure to meet already dismal cash flow and earnings expectations lead us to believe there is no 'turn' around the corner.

147.    On November 2, 2009, YRCW announced that it intended to launch an exchange offer in which YRCW's creditors would take 95% of YRCW's stock, effectively wiping out the Plan's investment in the Fund.   In significant part, YRCW's noteholders would exchange approximately $536.8 million in Notes for shares of common stock and a new Class A convertible Preferred Stock, which together on an as-if converted basis would represent 95% of the Company's common stock.  The exchange offer would create more than 1 billion new shares of stock on top of the 60 million currently owned by shareholders.  Once those new shares were issued, current shareholders would own about 5% of the company, effectively diluting the value of the Plan Participants' holdings by 95%.

148.    The market response to this announcement was swift and dramatic:  YRCW's stock price dropped 64% the day the exchange agreement was announced.

149.    Defendants were aware of the proposed exchange offer for at least most of the year prior to the announcement.  Commenting on the offer, YRCW's CEO, Bill Zollars stated, "This is something we've been talking about for most of the year in terms of the final step in our comprehensive play."

150.    On November 9, 2009, YRCW announced that it was commencing the exchange offer:

Overland Park, Kan., Nov 09, 2009 /PRNewswire-FirstCall via COMTEX News Network/ -- YRC Worldwide Inc. (Nasdaq: YRCW) announced that it is commencing an exchange offer today for all of the following outstanding series of notes:

-- the company's 5.0% Net Share Settled Contingent Convertible Senior Notes and 5.0% Contingent Convertible Senior Notes due 2023,

-- the company's 3.375% Net Share Settled Contingent Convertible Senior Notes and 3.375% Contingent Convertible Senior Notes due 2023, and

-- the 8 1/2% Guaranteed Notes due April 15, 2010 of the company's wholly owned subsidiary, YRC Regional Transportation, Inc.

with an aggregate face value of approximately $536.8 million, plus accrued and unpaid interest. The debt instruments will be exchanged for shares of the company's common stock and new Class A Convertible Preferred Stock in such amounts as are set forth in the company's Registration Statement on Form S-4 filed today with the Securities and Exchange Commission (the "SEC"), which together on an as-if converted basis would represent approximately 95% of the company's issued and outstanding common stock.

151.   The debt-for-equity exchange program increased the number of outstanding common shares listed on the NASDAQ exchange from 97 million to approximately 1 billion shares, an astonishing 1000% increase!

152.   In Defendants most recent financial disclosure YRCW reported a pre-tax loss of $899 million for 2009 and an operating loss of $95 million for the fourth quarter of 2009.

153.   The rating agencies, such as Fitch, continue to rate YRCW's default and credit ratings as **junk-bonds**.

154.   As reported in *Reuters* on March 16, 2010, YRCW's independent auditor, raised "substantial doubts about its [the Company's] ability to operate as a "going concern," due to "significant declines in operations, cash flows and liquidity."

47

155.   On this day, YRCW Stock closed at **$0.45 per share**.

156.   This drop in share price, which remained below $1.00 throughout a thirty-day period, resulted in YCRW's failure to comply with NASDAQ trading rules. If the Company stock continues to trade below $1.00 the security is at risk for being delisted from the exchange, effectively making the security untradeable and potentially worthless.

157.   As described above the Defendants, as fiduciaries of the Plan, were obligated to continuously ensure that the Plan's investment alternatives – in particular YRCW common stock – were prudent investments for the Plan's assets. However, Defendants failed to do so – to the detriment of the Plan and its participants. As a result, the Plan's imprudent investment in YRCW Stock have been decimated as indicated below:



*Source:*  http:www.bigcharts.com.

**Defendants Knew or Should Have Known That YRCW Stock Was an Imprudent Investment for the Plan, Yet Failed to Plan Participants**

158.    During the Class Period, although they knew or should have known that the Company's stock was an imprudent Plan investment, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in YRCW Stock.

159.    As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom was heavily invested in YRCW Stock, suffered unnecessary and unacceptable losses.

160.    Because of their high ranking positions within the Company and/or their status as Plan fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

161.    Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, the Company stock price would suffer and devastate participants' retirement savings once the truth became known. Yet Defendants failed to protect the Plan and their participants from foreseeable losses.

162.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in YRCW Stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock. Thus, Plan participants were precluded from properly assessing the prudence of investing in Company stock.

163.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Defendants also failed to conduct an appropriate investigation

into whether YRCW Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding YRCW's problems so that participants—to the extent that they were permitted—could make informed decisions regarding whether to include YRCW Stock in their Plan accounts.

164.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in YRCW Stock was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

165.    Because Defendants knew or should have known that YRCW was not a prudent investment option for the Plan, they had an obligation to protect the Plan and the participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in YRCW Stock.

166.    Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plan of YRCW Stock; discontinuing further contributions to and/or investment in YRCW Stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by YRCW they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of YRCW Stock.

167.    Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plan's investment in YRCW Stock. In

fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as YRCW's problems came to light.

**At Least Certain of the Defendants Suffered From Conflicts of Interest**

168.   YRCW's SEC filings during the Class Period, including Form DEF 14A Proxy Statements, make clear that a portion of certain officers' compensation, including Defendant Zollars, was in the form of stock awards and option awards. In 2008, for example, Defendant Zollars received $2,340,700 in stock awards and $82,035 in option awards. *See* YRCW Definitive Proxy Statement, filed with the SEC on April 1, 2009, at 30.

169.   Because the compensation of at least some of the Defendants was significantly tied to the price of YRCW Stock, such Defendants had incentive to keep the Plan's assets heavily invested in YRCW Stock on a regular, ongoing basis. Elimination of Company stock as an investment option for the Plan would have reduced the overall market demand for YRCW Stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of YRCW Stock, resulting in reduced compensation for such Defendants.

170.   Although certain Defendants may have had no choice in tying their compensation to YRCW Stock (because compensation decisions were out of their hands), they nonetheless retained the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up in YRCW Stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

171.   These conflicts of interest put certain Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, whose interests Defendants were obligated to loyally serve with an "eye single" to

the Plan. *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 309 (3d Cir. 2008); 29 U.S.C. § 1104(a)(1)(B).

## CLAIMS FOR RELIEF UNDER ERISA

172.     At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

173.     ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

174.     ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

175.     ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

176.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan*

*v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

- The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

- A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

- A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

177.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by cofiduciary,"

provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

178.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-

wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches

of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## CAUSES OF ACTION

**A.    Count I: Failure to Prudently and Loyally Manage the Plan and Assets of the Plan**

179.    Plaintiffs incorporate by reference the paragraphs above.

180.    This Count alleges fiduciary breach against all Defendants except the Director Defendants (the "Prudence Defendants").

181.    As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

182.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plan for the sole and exclusive benefit of the Plan's Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA.  The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options and directing the trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were at all times invested prudently.

183.    Yet, contrary to their duties and obligations under the Plan's documents and ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan.  Specifically, during the Class Period, these Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plan, but was, instead, an imprudent investment in light of the Company's fundamental weaknesses and the excessive risk associated with an investment in YRCW Stock.

184.   Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

185.   Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that YRCW common stock was imprudent and not a suitable and appropriate investment for the Plan. Investment in Company stock during the Class Period clearly did not serve the Plan's stated purpose. Despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

186.   Nonetheless, during the Class Period, these Defendants failed to act to protect the Plan and their participants and *inter alia* continued to permit the Plan to offer the Fund as an investment option for Employee and Matching Contributions and continued to permit the Plan to invest those contributions in the Fund and permit the Fund to invest in Company stock. They did so despite the fact that they knew or should have known that the prices of Fund and Company stock shares were excessively risky.

187.    The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because:  (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

188.    The Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Fund, but either had no such procedure or failed to follow it.   Moreover, they failed to conduct and act on the results of an appropriate investigation of the merits of continued investment in the Fund.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in the Fund under these circumstances.

189.    The Prudence Defendants breached their fiduciary duty respecting the Plan's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

190.    The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

191.    According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if:  (a) he has given appropriate consideration to those facts and circumstances that, given the

scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the

particular investment or investment course of action involved, including the role the investment or

investment course of action plays in that portion of the plan's investment portfolio with respect to

which the fiduciary has investment duties; and (b) he has acted accordingly.

192.    According to DOL regulations, "appropriate consideration" in this context includes,

but is not necessarily limited to:

> (a)    A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

> (b)    Consideration of the following factors as they relate to such portion of the portfolio:

>> (i)    The composition of the portfolio with regard to diversification;

>> (ii)    The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

>> (iii)    The projected return of the portfolio relative to the funding objectives of the plan.

193.    Given the conduct of the Company as described above, the Prudence Defendants

could not possibly have acted prudently when they continued to invest the Plan's assets in Company

stock because, among other reasons:

> (a)    The Prudence Defendants knew of and/or failed to investigate the failures of and dangers to the Company as alleged above; and

> (b)    The risk and volatility associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with investment in company stock.

194.     This abnormal investment risk could not have been known by the Plan's Participants, and the Prudence Defendants knew that it was unknown to them, as it was to the market generally, because the fiduciaries never disclosed it.

195.     Knowing of this extraordinary risk, and knowing the Participants did not know it, and given the volatility in the Company's stock the Prudence Defendants had a duty to avoid permitting the Plan or any Participant from investing the Plan's assets in the Fund or Company stock.

196.     Further, knowing that the Plan were not adequately diversified, but were heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

197.     The Prudence Defendants breached their fiduciary duties by, *inter alia*, failing to engage appropriate independent advisors who could make independent judgments concerning the Plan's investment in the Company; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's condition and inappropriate practices; and by otherwise placing their own and the Company's interests above the interests of the Participants with respect to the Plan's investment in Company stock.

198.     Defendants' duty of loyalty and prudence obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants with complete and accurate information,

and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

199.    With actual or constructive knowledge that Plan participants did not have full and complete information about the Company's problems, and thus were unable to make fully informed decisions about whether to retain their holdings in Company Stock, Defendants had the fiduciary obligation to inform Plan participants of the need to take action to protect their financial interests.

200.    Further, upon information and belief, the Company fostered a positive attitude toward the Company Stock and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative, material information concerning investment in the Company Stock. As such, participants in the Plan could not appreciate the true risks presented by investments in the Company Stock, and therefore could not make informed decisions regarding their investments in the Plan.

201.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that YRCW Stock was imprudent and not a suitable and appropriate investment for the Plan. Investment in Company Stock during the Class Period clearly did not serve the Plan's stated purpose. Despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensure as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

202.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

203.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.      Count II:  Breach of Duty to Avoid Conflicts of Interest**

204.    Plaintiffs incorporate by reference the allegations above.

205.    This Count alleges fiduciary breach against all Defendants (the "Conflicts of Interest Defendants").

206.    At all relevant times Defendants were fiduciaries within the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

207.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on Plan fiduciaries a duty of loyalty, that is, a duty to discharge his or her duties with respect to a Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

208.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent

judgments concerning the Plan's investments in the Company's own securities and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

209.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

210.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses in the hundreds of millions of dollars and Plaintiffs and the Participants indirectly lost a significant portion off their retirement investment.

211.    Pursuant to ERISA § 409 and ERISA § 502(a), 29 U.S.C. §§ 1109 and 1132(a), Defendants are liable to restore all losses to the Plan caused by their breaches of fiduciary duties.

## C.    Count III: Failure to Monitor Fiduciaries

212.    Plaintiffs incorporate by reference the allegations above.

213.    This Count alleges fiduciary breach against YRCW and the Director Defendants (the "Monitoring Defendants").

214.    As alleged above, upon information and belief, during the Class Period the Monitoring Defendants were de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

215.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

216.    Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

217.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

218.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

219.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)     failing, at least with respect to the Plan's investment in Company stock, to
        properly monitor his appointee(s), to properly evaluate their performance, or
        to have any proper system in place for doing so, and standing idly by as the
        Plan suffered enormous losses as a result of appointees' imprudent actions
        and inaction with respect to Company stock;

(b)     failing to ensure that the monitored fiduciaries appreciated the true extent of
        Company's precarious financial situation, and the likely impact that financial
        failure would have on the value of the Plan's investment in Company stock;

(c)     to the extent any appointee lacked such information, failing to provide
        complete and accurate information to all of their appointees such that they
        could make sufficiently informed fiduciary decisions with respect to the
        Plan's assets and, in particular, the Plan's investment in the Fund; and

(d)     failing to remove appointees whose performance was inadequate in that they
        continued to permit the Plan to make and maintain investments in the Fund
        despite the practices that rendered Company stock an imprudent investment
        during the Class Period.

220.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan
suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring
duties as described above, the losses suffered by the Plan would have been minimized or avoided.
Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan
and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

221.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.     Count IV: Co-Fiduciary Liability**

222.   Plaintiffs incorporate by reference the allegations above.

223.   This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

224.   As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

225.   As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

226.   Knowledge of a Breach and Failure to Remedy.  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those

breaches.  In particular, they did not communicate their knowledge of the Company's improper activity to the other fiduciaries.

227.   In particular, the Director Defendants and the Compensation Committee members knew of the Company's failures and precarious financial condition, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock.  Yet, they failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the Company's failed and inappropriate business practices and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

228.   Knowing Participation in a Breach.  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  The Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants because, as alleged above, they had actual knowledge of the facts that rendered Company stock an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted the Prudence Defendants to breach their duties.  Moreover, as alleged above, each of the Defendants participated in the management of the Plan's improper investment in the Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

229.   Enabling a Breach.  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

230.   The Monitoring Defendants failure to monitor the Prudence Defendants enabled those Defendants to breach their duties.

231.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost millions of dollars of retirement savings.

232.   Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**JURY DEMAND**

Plaintiffs demand trial by jury.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for:

A.   A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and participants;

B.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.   Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.   An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

66

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company stock;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including class certification if deemed necessary.

DATED: April 1, 2010

Respectfully submitted,

**DYSART TAYLOR LAY COTTER & MCMONIGLE P.C.**

By:   */s/ Don R. Lolli*
Don R. Lolli       KsBar#22538
Patrick J. Kaine   KsBar#15594
4420 Madison Avenue
Kansas City, MO 64111
Business Telephone: (816) 931-2700
Facsimile: (610) 667-7056
dlolli@dysarttaylor.com
pkaine@dysarttaylor.com

***Interim Liaison Class Counsel***

Robert A. Izard
William Bernarduci
**IZARD NOBEL LLP**
29 South Main Street, Suite 215
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290

rizard@izardnobel.com
wbernarduci@izardnobel.com

*Interim Co-Lead Class Counsel*

**BARROWAY TOPAZ KESSLER**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
280 King of Prussia Road
Radnor, PA 19087
Telephone.: (610) 667-7706
Facsimile: (610) 667-7056
eciolko@btkmc.com
jmeltzer@btkmc.com

*Interim Co-Lead Class Counsel*

**THE EGLESTON LAW FIRM**
Gregory M. Egleston
360 Furman Street, Suite 443
Brooklyn, NY 11201
Telephone: (646) 227-1700
Facsimile: (646) 227-1701
Email: greg.egleston@gmail.com

*Attorneys for Plaintiff Couch*

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky
Brian D. Long
919 North Market Street, Suite 980
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rigrodskylong.com
Email: bdl@rigrodksylong.com

*Attorneys for Plaintiff Couch*

Timothy J. MacFall
585 Stewart Avenue, Suite 304
Garden City, NY 11530

Telephone: (516) 683-3516
Email: tjm@rigrodskylong.com

**Attorneys for Plaintiff Couch**